UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**BENJAMIN F.,**

**Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL**
**SECURITY,**

**Defendant**.

Case No. 1:20-cv-0929-TPK

OPINION AND ORDER

## OPINION AND ORDER

    Plaintiff filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security.  That final decision, issued by an ALJ after the Appeals Council remanded the case, partially denied Plaintiff's applications for disability insurance benefits and for supplemental security income.  Plaintiff has now moved for judgment on the pleadings (Doc. 15), and the Commissioner has filed a similar motion (Doc. 17).  For the following reasons, the Court will **GRANT** Plaintiff's motion, **DENY** the Commissioner's motion, and remand the case to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

### I.  BACKGROUND

    On May 27, 2015, Plaintiff protectively filed his applications for benefits, alleging that he became disabled on January 1, 2010. That date was later amended to December 15, 2014.  After initial administrative denials of his claim, Plaintiff appeared at an administrative hearing held on February 6, 2018.  Both Plaintiff and a vocational expert testified at that hearing.

    The Administrative Law Judge issued an unfavorable decision on March 28, 2018.  After unsuccessfully seeking review from the Appeals Council, Plaintiff filed an action in this Court which ultimately led to a stipulated remand.  *See Benjamin F. v. Berryhill*, Case No. 1:19-cv-00265 (W.D.N.Y.), Doc. 8.  The Appeals Council subsequently remanded the case to the ALJ for further evaluation of Plaintiff's mental limitations.  (Tr. 875-80).

    The ALJ held a second administrative hearing on February 25, 2020, at which Plaintiff and a different vocational expert both testified. In the second (and partially favorable) decision, the ALJ first concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016.  Next, he found that Plaintiff had not engaged in substantial gainful activity since his amended onset date.  He then found that Plaintiff suffered from severe impairments including degenerative disc disease of the lumbar and cervical spine with

radiculopathy, high blood pressure, right shoulder impingement syndrome, chronic pain syndrome, depression, and anxiety. He further determined that these impairments, viewed singly or in combination, were not of the severity necessary to qualify for disability under the Listing of Impairments.

Moving on to the next step of the inquiry, the ALJ found that prior to July 25, 2019, Plaintiff had the residual functional capacity to perform a reduced range of light work. However, he could only occasionally balance, stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds. He could frequently push, pull, handle, and reach, although he could only occasionally reach overhead with his right arm and could only occasionally push, pull, and operate foot controls with his right leg. Also, he needed to avoid concentrated exposure to cold temperatures, fumes, dusts, odors, gases, poor ventilation, and other pulmonary irritants. He also could not work in an environment with hazards such as unprotected heights, machines with moving mechanical parts, and driving employer vehicles. Finally, he could maintain attention and concentration for two hours at a time and he could respond appropriately to changes in a routine work setting. After July 25, 2019, his condition changed, and he needed to be off task for 10% of the time due to the need to alternate positions and because of concentration and attention lapses caused by shoulder surgery and an increase in anxiety and depression. He would also be able to tolerate only few changes in a routine work setting.

The ALJ next determined that Plaintiff could not do his past relevant work as a construction worker. According to the testimony of the vocational expert, a person with Plaintiff's residual functional capacity as it existed prior to July 25, 2019 could perform jobs like mail sorter, small products assembler, and checker, but with the changes in his residual functional capacity which occurred after that date, he could not be gainfully employed. The ALJ therefore concluded that Plaintiff was not under a disability as defined in the Social Security Act prior to July 25, 2019, but was entitled to benefits thereafter.

Plaintiff, in his motion for judgment, raises three issues. He contends (1) that the ALJ's decision was based on lay evidence and not supported by the record; (2) that the ALJ made multiple errors in evaluating the opinion evidence of record; and (3) that the vocational expert's opinion was not consistent with the Dictionary of Occupational Titles and that the ALJ failed to resolve the conflict between the two.

## II.  THE KEY EVIDENCE

The Court will begin its review of the evidence by summarizing the testimony from the administrative hearings. It will then provide a summary of the most important medical records.

Plaintiff, who was 43 years old when he filed his applications, testified at the first administrative hearing that he lived with a friend and her daughter. He did not drive often due to numbness in his right foot. He had a high school diploma and last worked in December, 2014 as a stock person in a Walmart store. Before that he was a self-employed construction worker. He

stopped working due to pain and because he fell a number of times. The pain was in his lower back and side and it caused numbness in his leg and foot, mostly on the right side. Medications helped with the pain but did not eliminate it. He also had back surgery in 2016 and it helped restore some mobility in his toes. Plaintiff was also taking medication, prescribed by his primary care physician, for depression. Other than that, he had not undergone any mental heath treatment.

In his opinion, Plaintiff could not work because his pain prevented him from driving or lifting. He was unable to bend without significant pain and could not sit for longer than thirty minutes and could do no lifting or carrying. In a typical day he took his friend's daughter to meet the school bus and then did a few chores around the house. He was able to bathe himself but needed some help getting dressed. Also, he could not stand for more than fifteen or twenty minutes and could not walk very far. He usually napped during the day and said that his high blood sugar made him sleepy.

At the second administrative hearing, Plaintiff testified that he could only sit for ten minutes at a time before needing to change positions, could walk half a block, and could climb only a flight or two of stairs, and then only with difficulty. He did not think he could work for more than half an hour without taking a break. He was unable to lift his right arm over his head. Plaintiff also said that he had trouble focusing and maintaining attention due to pain as well as difficulty sleeping and thought that if working he would miss several days of work per month.

Upon questioning by the ALJ, Plaintiff reported that he had undergone shoulder surgery in July, 2019 and ankle surgery in 2017. He was wearing a back brace at the hearing and had done so for two years. He only left the house to do grocery shopping and for appointments and he did not socialize. He was able to use the internet and be on social media.

The vocational expert, Ms. Barsey, first testified that Plaintiff's past work as a stock clerk was heavy and semiskilled, and his other job was heavy and skilled. She was then asked questions about a hypothetical person with Plaintiff's vocational profile who could only do a reduced range of light work as determined by the ALJ for the time period prior to July 25, 2019. She responded that such a person could be employed as a mail clerk or mail sorter, small products assembler, and checker, which were all unskilled light jobs. She also gave numbers for those jobs as they exist in the national economy. Those jobs could still be done by someone who would be off task for 5% of the day but not for 10% of the day, and there were no other jobs available for that latter person. Additionally, being absent for two or more days per month would preclude employment. The expert was asked if her testimony was consistent with the DOT and she said that it was.

There are copious treatment notes which Plaintiff's memorandum accurately summarizes, and the Court will recount the significant findings in those notes only briefly here. It suffices to say that Plaintiff had been treated throughout the relevant time period for multiple impairments, but primarily low back pain, and that the notes showed, as early as 2013, abnormalities in the

entire lumbar spine with right-sided weakness and numbness.  He was diagnosed with chronic pain syndrome and treated with various medications, which, over time, included Lortab, Neurontin, Balcofen, Tramadol, and opioids.  He also had spinal injections on multiple occasions.  These treatments moderately alleviated his pain and he was able to work until sometime in 2014.  At most of his appointments his gait was slow and his strength was normal.

By 2015, his treating physician, Dr. Deahn, reported that Plaintiff had pain with sitting, standing, and physical activity and that the pain he experienced from riding in a vehicle had prevented him from doing his regular work.  As of that date, Dr. Deahn considered Plaintiff "disabled from any gainful employment for which he is capable." (Tr. 464).  In 2016, Plaintiff had back surgery after another course of injections which provided no relief.  Notes prior to the surgery show that he had altered sensation in his right leg and tenderness throughout the thoracic and lumbar spines.  He walked with a slow antalgic gait and showed positive straight leg raising bilaterally.  Postoperative notes showed improvement in the strength in Plaintiff's lower extremities but he still had numbness in his legs.  At that time, his lifting was limited to five pounds and he was not to bend, twist, push, or pull.  He was also reporting right hip pain to his primary care doctor which was made worse by walking.  Notes from October, 2016, showed that he continued to have soreness in his lower back but he could walk a short distance and had a normal gait.  Straight leg raising was positive on the right but not on the left.  He also had radicular pain with prolonged sitting, standing, walking, or bending.

In early 2017, a CT study showed mild progression of his degenerative disc disease at L2-L3 as well as moderate bilateral facet arthropathy from L4 through S1.  Plaintiff reported persistent low back pain which was quite severe at times.  He was pursuing a course of physical therapy but was making only slow progress.  By April, 2017, Plaintiff was still having chronic low back pain and difficulty with activities of daily living and mobility.  Dr. Deahn stated in his notes that Plaintiff had "permanent marked disability" and he prescribed morphine, among other medications, to address Plaintiff's pain. (Tr. 721).  Plaintiff reported an increase in pain in October, 2017, accompanying a tapering off of his medications.  A 2018 examination done by Dr. Moreland showed that Plaintiff walked with a slow and labored gait and appeared to be in a mild amount of distress.  At a follow-up visit, Plaintiff had severe back discomfort and straight leg raising was positive at ten degrees on the right side.  Dr. Moreland recommended that Plaintiff be weaned off narcotic medications and said that further surgery would not be of any benefit.  An x-ray from that time period showed multilevel spondylitic and discogenic changes at the intervertebral spaces which had not been addressed by the earlier spinal fusion.  Later notes from Dr. Deahn indicated that Plaintiff had problems with his right shoulder resulting from a fall and that he also had issues with his right foot both from an ankle fracture and due to radicular pain and loss of circulation, making him unable to stand for any length of time.  His back pain also continued to get worse as 2018 progressed.  However, a note from early 2019 indicated that his medication had allowed him to perform activities of daily living. As that year progressed, Plaintiff continued to report severe pain with activity of his right arm and intermittent numbness and tingling in his right hand.  On July 25, 2019, he underwent shoulder surgery.  Later, he developed neck pain radiating into his right arm which persisted despite physical therapy.

In January of 2020, Dr. Deahn completed another physical capacity evaluation form. On that form, he listed Plaintiff's symptoms as neck pain, back pain, foot pain, fatigue, dizziness, headaches, anxiety, depression, and right shoulder pain. Dr. Deahn concluded that Plaintiff's pain would constantly interfere with his attention and concentration and that although he was capable of a low stress job he could not sit or stand for a total of eight hours in a workday. Also, he would need unscheduled breaks and would miss more than four days of work per month. (Tr. 1129-33). Another medical provider, Dr. Clark, completed a similar form in 2020, evaluating only Plaintiff's cervical spinal impairment, and stating that Plaintiff could sit and walk for at least six hours each in a workday but needed to change positions at will, had restrictions in the use of his right arm, and would miss two days of work per month. (Tr. 1180-84). That latter conclusion is also contained in an evaluation done by Dr. Mason. (Tr. 1187-91).

Very early on in the process, two consultative examinations took place. First, Plaintiff underwent a consultative physical examination on September 8, 2015, performed by Dr. Liu. Plaintiff reported chronic low back pain as well as a right ankle fracture that occurred in 2010. He said his walking and sitting were extremely limited and that he shopped once a week and showered and dressed every day. He walked slowly and with a limp and could not do heel-to-toe walking due to pain. There were observed limits in the range of motion of his lumbar spine and straight leg raising was positive bilaterally. Dr. Liu concluded that Plaintiff had mild to moderate limitations for prolonged walking, bending, and kneeling. (Tr. 494-97).

Dr. Ippolito, a consultative examiner, performed a psychiatric evaluation on September 8, 2015. She noted that Plaintiff had stopped working due to back pain and that he had been prescribed medication for depression and anxiety by his primary care physician. His affect was depressed and his mood was dysthymic. Dr. Ippolito believed that Plaintiff could understand and follow simple directions and instructions, maintain attention and concentration, learn new tasks, perform complex tasks independently, and make appropriate decisions. She concluded that he had mild difficulty relating to others and a moderate limitation in dealing with stress. (Tr. 488-92).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

### IV.  DISCUSSION

### A.  Opinion Evidence

Plaintiff's first two claims of error are interrelated and will be discussed together.  In his first argument, Plaintiff contends that the ALJ's conclusion that Plaintiff's anxiety and depression increased only after his 2019 shoulder surgery, to the point where those impairments prevented him from working, has no support in the record, especially in light of what Plaintiff characterizes as "full ... support" in the record that Plaintiff "remained disabled throughout the entirety of the relevant period."  Plaintiff's memorandum, Doc. 15, at 19.  He couples this with arguments that the ALJ did not provide good reasons for rejecting the opinions of Drs. Deahn, Clark, and Mason (all treating sources), gave too much weight to Dr. Liu's opinion even though it was, in his words, "stale," and did not properly evaluate Dr. Ippolito's opinion.  These contentions require the Court to analyze the ALJ's decision in some detail.

After summarizing and partially rejecting Plaintiff's testimony about the severity of his symptoms, the ALJ concluded that limiting Plaintiff to light work with various postural and environmental restrictions, and in a work setting where Plaintiff did not have to maintain attention and concentration for more than two hours at a time and could respond appropriately to changes within a routine work setting, was an adequate accommodation of his degenerative disc disease of the lumbar spine, his hypertension, his chronic right ankle pain, his cervical spine disease, and his depression and anxiety.  One of the specific findings was that Plaintiff had moderate limitations in his ability to maintain concentration, persistence, and pace and to adapt and manage himself prior to the change in his condition which, according to the ALJ, occurred in conjunction with the July, 2019 shoulder surgery.

The ALJ then explained how he evaluated the opinion evidence.  First, he gave little

weight to Dr. Deahn's multiple opinions of permanent disability, explaining that the ultimate decision as to disability is reserved to the Commissioner and that the opinions were "vague." (Tr. 827). He similarly gave little weight to Dr. Deahn's 2020 opinion (although it was written after the ALJ found Plaintiff to be disabled), reasoning that it was found on a "check the box" form and that it conflicted with Dr. Deahn's earlier treatment records. Next, he gave some weight to Dr. Ippolito's opinion, finding her to be familiar with the requirements of the disability programs and noting that her opinion was generally consistent with the medical evidence. He acknowledged that she had found Plaintiff to have a moderate impairment in his ability to deal with stress but he also found her opinion to be vague and noted that she did not detail how Plaintiff's impairments affected his ability to perform work-related functions. (Tr. 827-28). As for Dr. Liu's opinion, the ALJ gave that one significant weight as being consistent with the examination results. He commented that Plaintiff had undergone back surgery after Dr. Liu's evaluation but concluded that "claimant's degenerative disc disease and radiculopathy [did not] persist[] at a level of severity that would reasonably preclude work within the residual functional capacity" found by the ALJ prior to July 25, 2019. (Tr. 828). Finally, he gave only little weight to any opinions expressed by Dr. Clark as they related to Plaintiff's condition prior to that date, and more weight to those from Dr. Mason (who treated Plaintiff as early as 2018), finding it consistent with the record, but he also stated that it was not accompanied by a detailed medical explanation and was rendered after Plaintiff was found to be disabled. (Tr. 828-29). The ALJ then concluded that Plaintiff's condition changed after July 25, 2019, stating that the shoulder surgery "could reasonably have caused an increase in the claimant's level of anxiety and depression." (Tr. 830). He specifically rejected those portions of the opinions of Drs. Clark and Mason that Plaintiff was capable of a low stress job because neither had treated Plaintiff for mental impairments.

The Court agrees with Plaintiff that there are multiple problems with the ALJ's reasoning here. The Court begins with the way in which the ALJ dealt with the various treating source opinions from Drs. Deahn, Clark, and Mason. Because Plaintiff's applications were filed prior to March 17, 2017, the following legal standard applies to an ALJ's evaluation of medical opinions from treating sources:

> "[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " [*Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir.2008)] at 128 (quoting 20 C.F.R. § 404.1527(c)(2)). There are, of course, circumstances when it is appropriate for an ALJ not to give controlling weight to a treating physician's opinion. *See, e.g., Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004) (per curiam) (holding that "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts"). Nevertheless, even when a treating physician's opinion is not given controlling

> weight, SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive. *See* 20 C.F.R. § 404.1527(c)(2)(I), (2)(ii), (3)–(6). "[T]o override the opinion of the treating physician, we have held that the ALJ must explicitly consider, inter alia: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir.2013) (per curiam). "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.' " *Burgess*, 537 F.3d at 129 (alteration in original) (*quoting Halloran*, 362 F.3d at 33). The failure to provide " 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id*. at 129–30 [citation omitted]. The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion. *Id*. at 131.

*Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015).

Here, the ALJ provided only an inadequate explanation for his rejection (or partial rejection) of the multiple opinions from the treating sources. His explanation of why he gave almost no weight to the opinions of Dr. Deahn, who was the long-term treating source, does not follow the appropriate legal pathway. While it is true that the ultimate decision as to disability is reserved to the Commissioner and involves more than medical judgments, that is not a good reason to reject a treating source's view as to specific limitations resulting from a claimant's severe impairments. "Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation...to explain why a treating physician's opinions are not being credited." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). Further, it is not sufficient simply to say that an opinion can only be given little weight because is contained on a "check the box" form. This Court has said that "'[t]here is no authority that a 'check-the-box' form is any less reliable than any other type of form; indeed, agency physicians routinely use these types of forms to assess the intensity, persistence, or limiting effects of impairments.'" *Garcia Medina v. Comm'r of Soc. Sec.*, 2019 WL 1230081, at *3 (W.D.N.Y. Mar. 15, 2019), *quoting Trevizo v. Berryhill*, 2017 WL 4053751, at *8, n.4 (9th Cir. Sept. 14, 2017). Dr. Deahn provided copious treatment notes along with the forms he completed, which should have been sufficient to allow the ALJ to determine how well-supported the conclusions were which Dr. Deahn recited on those forms. Although the ALJ made a passing reference to the treatment notes, he provided only a blanket assertion that they conflicted with Dr. Deahn's opinions without citing to any specifics in support of that conclusion. This, too, conflicts with the regulatory rule that good reasons - including identifying those particular treatment notes deemed inconsistent with the physician's views - be provided in support of the rejection of a treating source opinion, and that the failure to do so prevents meaningful judicial review of the ALJ's reasoning process. *See, e.g., Cabassa v. Astrue*, 2012 WL 2202951, *8 (E.D.N.Y. June

13, 2012).  Lastly, the observation that the treating source opinions are vague - an assertion not necessarily borne out by this record - is normally a reason to seek clarification and not a justification for assigning the opinion only little weight.  *See, e.g., Abualteen v. Saul*, 2020 WL 5659619, at *29 (S.D.N.Y. Sept. 23, 2020) ("if the ALJ believed that [the treating source] opinion could not be properly evaluated because it was 'vague,' or lacked a necessary functional assessment, then the ALJ should have taken additional measures to follow up with [the physician] rather than discount the opinion").

The conclusion that the ALJ did not properly evaluate any of the treating source opinions obviates the need to discuss in depth the remaining portions of Plaintiff's argument on this issue. Certainly, on remand, the ALJ must consider the extent to which Dr. Liu's opinion predated much of the relevant medical evidence - almost four years elapsed, and two surgeries occurred, between his evaluation and the date on which the ALJ found Plaintiff to be disabled - and, of course, Dr. Liu's opinion (which in itself is relatively vague as to specific functional limitations) comes from a one-time examiner and conflicts with contemporaneous and later treating source opinions.  Plaintiff is also correct that the ALJ did provide much explanation about why he thought that the 2019 shoulder surgery was a watershed moment in the progression of Plaintiff's mental impairments; that issue should also be addressed, and the ALJ should make an effort to support any new residual functional capacity finding with citations to the record as a whole, including how that finding can be reconciled with the expert opinions.  The Court also is troubled by the fact that the ALJ found Plaintiff had a moderate ability to respond to stress but did not, for example, limit him to the performance of simple, routine tasks in a workplace without production quotas or fast-paced work.  A remand will permit further consideration of all of these issues.

### B.  Consistency with the DOT

The other issue presented in Plaintiff's memorandum is whether the ALJ had an obligation to make further inquiry into whether the vocational expert's opinion was consistent with the DOT.  Remand on the residual functional capacity issue has the potential to moot this issue if there is a different finding on the RFC question.  To the extent that any new RFC also has reaching restrictions, however, the ALJ should affirmatively determine how the vocational expert reconciles such restrictions with the functional requirements (as set out in the DOT) of any jobs which the expert believes Plaintiff to be capable of performing.

### V.  CONCLUSION AND ORDER

For the reasons set forth in this Opinion and Order, the Court **GRANTS** Plaintiff's motion for judgment on the pleadings (Doc. 15), **DENIES** the Commissioner's motion (Doc. 17), and remands this case to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

/s/ **Terence P. Kemp**
**United States Magistrate Judge**